CITY OF MONTPELIER *v.* BENJAMIN GATES ET AL.

November Term, 1933.

Present: POWERS, C. J., SLACK, MOULTON, THOMPSON, and GRAHAM, JJ.

Opinion filed May 13, 1933.

118

*George L. Hunt,* City attorney, for the petitioner.

*Lawrence C. Jones,* Attorney General (*H. H. Blanchard* and *James Brownlee,* of counsel) for the petitionees.

POWERS, C. J. This is a petition for a writ of mandamus to compel the fiscal officers of the State to pay to the petitioner and certain interveners their respective claims under section 48, part I, of the Income and Franchise Tax Act of 1931, Acts 1931, No. 17, part I, § 48. The petition is answered and demurred to. In view of the importance of the case to the State and its officers, and the facts being conceded, the demurrer will be construed as a motion, *Clement* v. *Graham,* 78 Vt. 290, 306, 63 Atl. 146, Ann. Cas. 1913E, 1208, and the merits of the controversy disposed of without regard to the technical sufficiency of the pleadings.

As is shown in *Town of Brandon* v. *Harvey,* 105 Vt. 435, 168 Atl. 708, 710, prior to the passage of the act above referred to, the towns of the State were enjoying the benefit of whatever revenue was derived from the taxation of intangibles, but were required to pay to the State certain State taxes assessed by law. But by the Act of 1931, a radical change was made in the State's taxing scheme. The tax on intangibles was made payable to the State by way of a tax on incomes, and to compensate the towns for this loss of revenue, the State taxes were abolished. And as a further compensation to such towns as had been receiving more intangible taxes than their State taxes amounted to, section 48 was written into the Act. By the terms of that section various sums were the subject of reimbursement to the towns here standing as petitioners and were to be paid upon certificates issued by the tax commissioner. Such certificates have been issued and presented for payment—which was refused. Whereupon, this proceeding was instituted.

The defendants insist that payment of these claims should not be ordered because the Legislature has made no valid appropriation therefor.

 That authority of law is indispensably necessary to an expenditure of State funds is unquestionable. Section 27, of chapter II, of our State Constitution provides that ''no money shall be drawn out of the treasury, unless first appropriated by act of the legislature.'' It is to be noticed that this provision is couched in general terms. No particular requirements are specified. Its purpose is ''to secure regularity, punctuality and

fidelity in the disbursements of the public money.'' Story, Const., § 1342. It is not, and was not intended to be, a restriction of the power of the Legislature over the public revenue. It is the province of that body to cast the appropriation in a mould of its own making. Under it, no particular form of expression is necessary. No technical words are required. All that is essential is that the Legislature, by a valid enactment, shall assign to a particular use a sum of money from the public revenues. *Grout* v. *Gates,* 97 Vt. 434, 448, 124 Atl. 76. Such an act authorizes the proper officers to draw and use the same accordingly. Merely authorizing such officers to pay a certain claim amounts to an appropriation. *People ex rel. McCauley* v. *Brooks,* 16 Cal. 11, 29; *Bosworth* v. *Harp,* 154 Ky. 559, 157 S. W. 1084, 45 L. R. A. (N. S.) 692, Ann. Cas. 1915C, 277; *Carr* v. *State et al.,* 127 Ind. 204, 26 N. E. 778, 11 L. R. A. 370, 372, 22 A. S. R. 624; *State* v. *Jorgensen,* 25 N. D. 539, 142 N. W. 450, 49 L. R. A. (N. S.) 67.

It is not necessary that the money be in the treasury at the time the appropriation is made, *People ex rel. McCauley* v. *Brooks, supra.* Nor is it necessary that the exact sum be stated by the Legislature. *Highgate* v. *State,* 59 Vt. 39, 49, 7 Atl. 898. In the eye of the law, that is certain which can be made certain, and it is quite within the province of the Legislature to make an appropriation to cover a claim the amount of which is to be ascertained in the manner specified in the act. This is the law of the case last cited. The plain and simple rule that when the Legislature, referring to a claim that the State should pay, authorized the auditor to draw his order on the State treasurer for its payment, a constitutional appropriation has been made, has the sanction of many years of legislative practice. For years this was the usual, if not the only way, money was drawn from the treasury to pay the State's bills. This practice grew up under statutes of a most general character, of which section 46, tit. IV, ch. 8, G. S., may be taken as a sample: ''It shall be the duty of the auditor of accounts to examine and liquidate all accounts against the State, * * * and allow such sum as he shall find justly due and proved by proper vouchers or other satisfactory evidence, and draw orders upon the treasurer for the same.'' It was not until 1874, that what may properly be called a general appropriation bill was passed by the Legislature; and not until 1917, that State expenditures

were budgeted. So far as legality goes, the old practice was as good as the new is, for as Field, C. J., says in *People ex rel. McCauley* v. *Brooks, supra:* "When the constitution, therefore, says that 'no money shall be drawn from the treasury but in consequence of appropriations made by law,' it only means that no money shall be drawn except in pursuance of law."

Nor does G. L. 540 stand in the way. Therein it is provided that "unexpended balances" shall be covered into the treasury on the first day of July in each year. Assuming that the term "unexpended balances" applies to such cases as the one here presented, the justice of these claims and the rights of these parties are not affected. When a sum is "covered" into the treasury, it ceases to be "earmarked" for the payment of a specific claim, and becomes available for the payment of any just debt against the State for which an appropriation has been made and which is not payable out of a particular fund. But it remains equally available for the payment of the claim for which it was originally appropriated, if funds are in hand when the auditor's order reaches the treasurer. It is all a matter of bookkeeping, and an honest creditor is not to be denied, simply because the payment of his claim may somewhat upset the treasurer's books. Moreover, as we were told at the argument, in a case like this, the "covering" process does not involve bookkeeping entries, even. We cannot accept the defendants' theory that the appropriations here in question lapsed on June 30, 1933. The Illinois case on which they predicate this claim, *People* v. *Brown*, 281 Ill. 390, 118 N. E. 67, 5 A. L. R. 563, is not applicable to this case. The Constitution of that state, article 4, section 18, expressly provides that appropriations shall end on a specified date. Nothing of this kind appears in our Constitution or in any statute of this State that can affect this case. There is nothing in No. 7, Acts of 1923, that in any way embarrasses these petitioners. Section 27 of that act provides that, except for money held by the State in trust, no money shall be paid out of the State treasury unless it was specifically appropriated at a biennial session of the Legislature, or a special session within the biennial period. And the auditor is forbidden to draw a warrant upon the treasurer, except for the payment of specific appropriations duly made in pursuance of the provisions of that section. Granting that it was the purpose of this section to put an end to appropriations

to continue beyond the biennial period in which they were made, the rights of the petitioners are unaffected. The money for these claims was appropriated in 1931 for the biennial period then beginning. The ascertainment of the various sums due under section 48 were ascertained by the commissioner of taxes and his certificate issued during that biennium. Whatever obligation resulted from section 48 during that term is covered by the appropriation, though the auditor or treasurer or both failed to respond to the demand made legal by the certificate until that period had expired. It appears that the fiscal officers of the State, with the approval of the Governor, had prior to the execution of the certificates herein involved, fixed October 15 as the date on which they should be payable. This was done to make them due at a time when the treasury would be in condition to pay them. The petitioners acquiesced in this arrangement and held their certificates. It would be highly unjust for them to be prejudiced by this action; happily enough, they are not. We hold that the money specifically appropriated for their payment is now available therefor.

Section 4, No. 19, Acts of 1931, does not apply, as it only affects ''sums hereinafter appropriated''—which do not include the appropriations made under No. 17, of the same year. Section 65, of No. 19, Acts of 1931, only refers to what had been done before its passage. And section 72, of No. 29, Acts of 1933, does not aid the State, for assuming, but by no means admitting, that section 48 conflicts with it, section 71 of that act contains this provision: ''This act shall not be construed in any way to negative or impair the full force and effect of existing laws relating to taxation and for disposition of the funds raised thereby, * * * lawful rebates from the State treasury,'' etc. Section 48 is a law relating to the disposition of funds raised by taxation, which are lawful rebates from the State treasury. The most important question in the case, as we see it, challenges the constitutionality of section 48, of the Acts of 1931 hereinbefore referred to. As we have seen, an appropriation is therein made to each town and city of a sum equal to the excess of the amount received from intangible taxes in 1930, over the amount paid that year for the State taxes. The purpose of this section is apparent. It was to further compensate such towns and cities for loss of revenue. The Legislature knew that without this provision such towns and cities

would be prejudiced in a financial way by the new scheme embodied in the act referred to. The Legislature saw that the towns and cities of the State would fall into the following classes:

1. Those which, under the old law, received no taxes from intangibles. This group would gain by the new law a sum equal to the amount of their State taxes.

2. Those wherein the amount received from taxes on intangibles just equaled the amount of their State taxes. This group would gain nothing—lose nothing.

3. Those whose State taxes exceeded their intangible taxes. This group would gain just the amount of that excess.

4. Those which had received more from intangibles than their State taxes amount to. This group would lose an amount equal to that excess, and would be the only towns and cities in the State to make a net loss by the change in the law.

Here, then, was a situation which the Legislature thought it fair and wise to alleviate. The purpose which prompted the insertion of section 48, was to equalize the burden resulting from the change of the law, and not to create a favored group of towns and cities; and it is certain that the State may properly compensate towns for a burden put upon them for its benefit. *In re Opinion of the Justices*, 84 N. H. 557, 559, 149 Atl. 321, 332. It may be that a better way might have been found to accomplish the legislative purpose, but that fact alone would not establish the invalidity of the plan adopted. They chose the year 1930 on which to base the refund. They might, perhaps, have made a wiser choice. It is said that using the year 1930, owing to changed conditions, now results in an undue advantage to the petitioners and the others in class 4. If this be so, it presents a question for the Legislature, not the Court, to handle. It comes to this: It is all a question of classification for taxing purposes. If section 48 rests upon a rational basis, a difference reasonably adapted to the purpose of the Legislature, the classification therein made is free from constitutional objections. We have said enough to show its validity. For, it is not palpably arbitrary; it rests upon a difference that bears a just relation to the purpose to be served. *State* v. *Caplan*, 100 Vt. 140, 153, 135 Atl. 705; *Town of Hartland* v. *Damon's Estate*, 103 Vt. 519, 525, 156 Atl. 518. The fact, if it exists, that conditions have changed can have no retroactive effect on

its validity. So far as these go, an act of the Legislature valid when passed, remains so as long as it stays on the books.

If we admit that one municipality cannot be taxed for the sole benefit of another, and that the whole State cannot be taxed for the exclusive advantage of a particular town, it does not affect this case. There is nothing unconstitutional in a law that accords an advantage to a certain group of towns, provided the advantage is equally available to every town eligible to the group, and provided the grouping is properly based under the rule hereinbefore stated.

It is argued that these defendants, for lack of interest in the result, cannot question the constitutionality of this act. There has been some conflict in the decisions on this question. But it has come to be quite generally held—upon sound legal principles, we think—that where, as here, the officer involved is not a ministerial officer of subordinate authority, but one who will, under his oath of office, violate his duty or otherwise render himself liable by the performance of the act enjoined upon him by the statute in question, if invalid, he is sufficiently interested to enable him to raise the question of the validity of the statute in a mandamus proceeding to compel him to comply therewith. *State* v. *Candland,* 36 Utah, 406, 104 Pac. 285, 24 L. R. A. (N. S.) 1260, 1266, and note; *State* v. *Clausen,* 65 Wash. 156, 117 Pac. 1101, 37 L. R. A. (N. S.) 466, 470; *Van Horn* v. *State,* 46 Neb. 62, 64 N. W. 365; *Denman* v. *Broderick,* 111 Cal. 97, 43 Pac. 516; *Norman* v. *Kentucky Board, etc.,* 93 Ky. 537, 20 S. W. 901, 18 L. R. A. 556, 557; *McDermont* v. *Dinnie,* 6 N. D. 278, 69 N. W. 294; note to *State* v. *Board, etc.* (Fla.), 30 A. L. R. at page 390 *et seq.*

This must be so if, as we are taught, an unconstitutional statute is a mere nullity that confers no rights, imposes no duties, and affords no protection. Then, too, these defendants are, in a very real sense, the custodians and conservators of the public funds, which they are forbidden to disburse except as the Legislature appropriates them. It is their sworn duty to execute their respective offices "according to law." Upon the plainest legal principles, they have the right to raise the constitutional questions here presented. *State* v. *Woollen,* 128 Tenn. 456, 161 S. W. 1006, Ann. Cas. 1915C, 465, 475; *Stockman* v. *Leddy,* 55 Colo. 24, 129 Pac. 220, Ann. Cas. 1916B, 1052, 1053; *Commonwealth* v. *Matthews,* 210 Pa. 372, 59 Atl. 961.

Upon full consideration of all the questions argued, we are convinced that the petitioners are entitled to the relief prayed for and should no longer be denied.

*Judgment that the prayer of the petition be granted, without costs, and that a mandate issue forthwith directing the auditor of accounts to draw orders on the State treasurer for the several amounts. due to the petitioners as shown by the certificates of the commissioner of taxes, and directing the State treasurer to pay the same, when presented, out of any funds in hand not otherwise assigned.*