ESTATE OF CHARLES I. BUTTON ET AL. *v.* DAVID V. ANDERSON ET AL.

May Term, 1942.

Present: MOULTON, C. J., SHERBURNE, BUTTLES, and JEFFORDS, JJ. and ADAMS, Supr. J.

Opinion filed October 6, 1942.

532

*Madeleine C. Wood* for petitioner.

*Alban J. Parker,* Attorney General, and *Clifton G. Parker,* Deputy Attorney General, for the petitionees.

JEFFORDS, J.   On February 11, 1932, Hon. Stanley C. Wilson, at that time the Governor of this State, on behalf of the State, and Charles I. Button, Esq., of Middlebury and Clarence W. De Knight, a member of the New York bar, entered into a written contract.   Under this agreement the two attorneys were to take charge of, prosecute and endeavor to collect and recover from the government of the United States the claim of the State of Vermont for expenditures for military purposes in the war of 1812-1815 with Great Britain.   It was provided in the contract that: "For and in consideration of the services rendered and to be rendered by the parties of the second part, and any associate or associates they may employ in the prosecution of said claim or claims, the party of the first part, the State of Vermont, by its said Governor, hereby agrees to pay to the parties of the second part, their heirs or legal representatives, a fee equal to twenty five per cent of whatever sum of money or other evidence of debt which may be awarded the State of Vermont on account of said claim or claims."   It was also therein stipulated that the State was not to be liable for any costs or expenses incurred in the prosecution of the claim.

The governor was authorized and empowered to enter into this contract by G. L. sec. 354 (now P. L. sec. 382).   He was authorized specifically by Joint Resolution appearing as No. 287 of the Acts and Resolves of the General Assembly of 1931. This resolution after setting forth that the State had expended large sums in the prosecution of the war of 1812-1815 which had never been repaid and that repeated attempts at reimbursement had not been successful provided that: "The Governor be authorized and empowered to contract for the services of such special counsel or agent of the State as he may choose and on such terms as shall appear to the Governor for the public welfare, provided

the same shall be by contingent fees with no expense to the State of Vermont, unless a part or a whole of said claim shall be recovered from the Government of the United States of America.''

The two lawyers prosecuted the claim with very successful results, an award being made in the amount of $90,015.85. Of this sum $53,578.65 was an item of interest for about 122 years at 6% which the State previous to the employment of these attorneys apparently was not aware it was entitled to on a certain portion of its claim. On March 12, 1942, a check for the amount of the award was received by the state treasurer which has been deposited.

A few days before the receipt of the check Madeleine C. Wood, employed as associate counsel in connection with the prosecution of the claim, conferred with the attorney general and the present governor in regard to payment of the contingent fee. At that time she requested of the former that when the payment should be received a sum equal to 25% of the amount should be reserved for the payment of such fee, as she stated that when the fund should come to the State it would be charged with the payment of the fee. She also stated to him that the fee could properly be paid from the contingent fund provided for by sec. 10 (b) of No. 26 of the 1941 appropriation act. On that same day Miss Wood conferred with Governor Wills and requested that he and the state treasurer, together acting as the board of appropriations, transfer a sufficient amount from the contingent fund to the proper department to pay the fee if it should not be paid from the money received from the federal government. A short time after these conferences the attorney general gave a written opinion to the governor which stated, in effect, that because of certain statutory provisions therein referred to the auditor of accounts was prohibited from issuing his warrant for the payment of this fee after the money might be received by the State and that the claim should be laid before the legislature as one for services rendered to the State.

On April 13, 1942, a formal proof of claim was presented to the auditor of accounts. Demands were made upon him to issue his warrant for the payment of the same and upon the state treasurer for its payment, which demands were refused. Demands were also made on the treasurer and the governor to

transfer a sufficient amount from the contingent fund to pay the claim and this demand was refused. Whereupon this petition for a writ of mandamus was brought against David V. Anderson as auditor of accounts and Thomas H. Cave as state treasurer to command the former to allow the claim and issue his warrant for the payment of the same in the amount of $22,503.96 and to command the latter to pay such warrant when issued. A claim for $234.24 representing certain interest is also made. It is stated in the petition that the petitioners have not learned whether this latter amount has been received by the State but similar prayers are made as to its payment when received.

Statements above appearing are contained in the petition and the facts therein set forth are admitted by the defendants in their answer, which is in the nature of a demurrer, to be true. The petition also sets forth that both Button and De Knight as well as Adrien Sizer, an associate counsel, have deceased and that it is brought by the legally qualified representatives of their estates in conjunction with Miss Wood.

The defendants in their brief and in oral argument concede that there is no question but that the State owes the $22,503.96 claimed by the petitioners but they say that payment of the same cannot legally be made except by a special appropriation from the legislature. They base their claim on the provisions of sections 463, 488 and 512 of the Public Laws and also on section 1 of No. 26 of the Acts of 1941.

The position of the petitioners is based on two general grounds. The first is, in effect, that the fund received by the State was charged with a lien and to the extent of this lien it never properly became any part of the funds of the State so that no appropriation is required to authorize the payment to them, as that part of the fund on which the lien exists provides its own appropriation. The second ground is that in the event the first is held untenable there is an available appropriation from which payment can legally be made, i.e., the contingent fund above referred to. They maintain that the lien can be considered either as an equitable lien in consequence of the contract or as an attorney's charging lien independent of the same. We shall consider these claims in the order presented.

██ Where the parties have contracted that the attorney

shall receive a specified amount of the recovered fund, such agreement will create an equitable lien on the fund in favor of the attorney to the extent of the amount stipulated. 5 Am. Jur. 394, sec. 221; 6 C. J. 769, sec. 366. That this rule is not universally applied is indicated in the above sections and see *Enos* v. *Keating,* 39 Wyo. 217, 271 Pac. 6, 275 Pac. 131, 67 A. L. R. 430, which, however, it should be noted, had to do with an executory contract. Such has been the law, however, of the Supreme Court of the United States at least since the case of *Wylie* v. *Coxe,* 15 How. 415, 14 L. ed. 753. It has been reaffirmed and applied in other cases among which are *Ingersoll* v. *Coram,* 211 U. S. 335, 29 S. Ct. 92, 53 L. ed. 208, and *Barnes* v. *Alexander,* 232 U. S. 117, 34 S. Ct. 276, 58 L. ed. 530. See also *Harwood* v. *La Grange,* 137 N. Y. 538, 32 N. E. 1000; *Delval* v. *Gagnon,* 213 Mass. 203, 99 N. E. 1095; *Grand Rapids & I. Ry. Co.* v. *Cheboygan Circuit Judge,* 161 Mich. 181, 126 N. W. 56, 137 Am. St. Rep. 495. We believe it to be a safe and just rule to follow and consequently adopt it. Contracts of this nature for compensation on basis of share or percentage of the fund to be recovered as creating equitable liens are not confined to agreements between attorney and client. *Geddes* v. *Reeves Coal & Dock Co.,* 20 F. (2d) 48, 54 A. L. R. 282; *Wardman* v. *Leopold,* 85 F. (2d) 277, 106 A. L. R. 1487. This view is apparently taken by Pomeroy. See 3 Pom. Eq. Jur. sec. 1236, where cases involving contracts of various kinds, including those between attorney and client, are cited in support of the text relating to contracts creating equitable liens on property to be acquired in the future. It follows, therefore, that agreements of this kind may confer rights which are independent of and different from those created by an attorney's retaining or charging lien and this is either expressly held or fairly indicated in the following cases: *McPherson* v. *Cox,* 96 U. S. 404, 24 L. ed. 746, 751; *Bent* v. *Lipscomb,* 45 W. Va. 183, 31 S. E. 907, 72 Am. St. Rep. 815; *Grand Rapids, etc.,* v. *Cheboygan, etc., supra; Lindberg* v. *Humphrey,* 289 Fed. 901, 905; *Delval* v. *Gagnon, supra.* Consequently the rules and restrictions pertaining to attorney's retaining and charging liens created merely by the common law do not necessarily apply to equitable liens arising by virtue of an express agreement between attorney and client so that the rights claimed by the petitioners

under the contract can properly be determined without regard to their rights, if any, by virtue of a common law charging lien.

■ Our first task is to determine whether the contract in question did create an equitable lien on the fund when received. It may be stated at the outset that such liens do not arise merely by virtue of a contract for a contingent fee. The test is whether the party contracting for the services sufficiently indicates an intention to make the fund described in the contract security for the debt. Such intention need not be express but may be implied from the terms of the agreement construed with reference to the situation of the parties at the time of the contract and by the attendant circumstances. If such intention appears a lien is created, otherwise not. Or, to put it differently, it must appear that the other contracting party looked to the fund itself for payment and did not rely on the personal responsibility of the owner of the claim of which the fund was the result. For authority for these statements see 3 Pom. Eq. Jur. sec. 1235; *Ingersoll* v. *Coram, supra; Barnes* v. *Alexander, supra; Walker* v. *Brown,* 165 U. S. 654, 17 S. Ct. 453, 41 L. ed. 865; *De Winter* v. *Thomas,* 34 App. D. C. 80, 27 L. R. A. (N. S.) 634. It should be noted that in the latter case it is stated, in effect, that if the intention is not expressly stated it must appear by necessary implication. It seems to us that if the intention is reasonably indicated that is sufficient and this appears to be the test laid down by Pomeroy and the other cases referred to on this point.

It can be seen that whether or not the contract in question created a lien is a matter of construction and that its form is not particularly material. It is stated by Pomeroy in sec. 1237 of his work that: ''The form or particular nature of the agreement which shall create a lien is not very material, for equity looks at the final intent and purpose rather than at the form; and if the intent appear to give, or to charge, or to pledge property, real or personal, as a security for an obligation, and the property is so described that the principal things intended to be given or charged can be sufficiently identified, the lien follows.''

*Barnes* v. *Alexander, supra,* was a proceeding in equity. The agreement which was there enforced consisted of the oral statement of Barnes to Street and Alexander, all the parties being

attorneys, that "If you will attend to this case I will give you one-third of the fee which I have coming to me on a contingent fee from Shattuck, Hanninger and Marks." The fee had been paid over and at the time this suit was brought the fund in question had been received by Mrs. Barnes, her husband apparently having deceased. The defense to the claim was that the promise was merely personal and gave no specific claim against the fund. The decree of the court below was that Mrs. Barnes was liable to Street and Alexander for one-third of the fee which she had received. This judgment was affirmed. The language of the late Mr. Justice Holmes (omitting the citation of cases) in delivering the opinion of the Court is as follows:

> "Obviously the only thing intended or desired was to give the appellees a claim to one-third of the fund received by Barnes if and when he should receive it. It is true that there was in a sense a *res* as to which present words of transfer might have been used. There was a right vested in Barnes unless discharged to try to earn a fee contingent upon success. But in a speculation of this sort the parties naturally turned their eyes toward the future and aimed at the fruits when they should be gained. They therefore used words of contract rather than of conveyance; but the important thing is not whether they used the present or the future tense but the scope of the contract. In this case it aimed only at the fund. Barnes gave no general promise of reward; he did not even give a promise qualified and measured by success to pay anything out of his own property, referring to the fund simply as the means that would enable him to do it. He promised only that if, when and as soon as he should receive an identified fund, one-third of it should go to the appellees. But he promised that. At the latest, the moment the fund was received the contract attached to it as if made at that moment. It is an ancient principle even of the common law that words of covenant may be construed as a grant when they concern a present right. And it is one of the familiar rules of equity that a contract to convey a specific object even before it is acquired

will make the contractor a trustee as soon as he gets a title to the thing.

"The obligation of Barnes was as definitely limited to payment out of the fund as if the limitation had been stated in words, and therefore creates a lien upon the principle not only of *Wylie* v. *Coxe, supra,* but of *Ingersoll* v. *Coram,* 211 U. S. 335, 365, 368, 29 S. Ct. 92, 53 L. ed. 208, 229, 230, which cites it and later cases."

The case of *Ingersoll* v. *Coram, supra,* had to do with an attorney's agreement in a will case. It was provided in the contract of employment that in the event the will was broken the fee should be $100,000 and that the expenses of the attorney were to be paid in any event. It was expressly stipulated in the agreement that there was to be no personal obligation on the part of one of the contracting parties in the event that the contest should be unsuccessful and that in no event was he to be obligated except to pay such fee out of the funds secured from the estate. It was held that this contract created a lien on the distributive shares of the client under authority of *Wylie* v. *Coxe, supra,* and *Walker* v. *Brown,* 165 U. S. 654, 17 S. Ct. 453, 41 L. ed. 865, and other cited cases. It was also held that the facts disclosed the necessary elements for the creation of a lien of appropriation of the fund by the debtor, and an agreement that the creditor should be paid out of it.

Tested by the principles set forth in the authorities heretofore referred to on this point it is our opinion that a valid lien was created in the present case, under the contract, which attached to the fund at the latest, when it was received by the State. It must be that the two attorneys and Governor Wilson, who is a lawyer of high standing, knew when they signed the contract that the Governor on behalf of the State could make no general promise of payment which could be fulfilled except by an appropriation on the part of the legislature. It is reasonable to assume, and indeed it seems that this assumption is compelled, that having this fact in mind it was intended by all parties concerned to make the fund, if recovered, security for the debt, as represented by the agreed fee, and that the two attorneys should be paid out of the same. It seems clear in

view of the situation there existing that the latter looked to the fund for payment rather than the mere contractual obligation of the State dependent for fulfillment upon legislative action. It appears to us that the situation here presents a stronger case for the petitioners than would exist if the contract in question were made by private individuals.

We have taken note of the fact that in the *De Winter* case, *supra,* it was held that language similar to that here used did not disclose an intention to create a lien. It is stated in the annotation to the case appearing in 27 L. R. A. (N. S.) at 634 that the distinction apparently made in that case is ''extremely shadowy.'' But if it can be said that the case turned on the form of the contract there involved it is therein recognized that the matter is one of construction. It should also be noted that in *Nutt* v. *Knut,* 200 U. S. 13, 26 S. Ct. 216, 50 L. ed. 348, it was held that the clause in the contract providing that the compensation was to be a sum equal to $33\frac{1}{3}\%$ did not create any interest in the claim or in the money paid over to the claimant by the government but only established an agreed basis for settlement after payment and created a legal obligation which could have been enforced by suit. The construction given in that case was followed in *Shouse* v. *Consolidated Flour Mills Co.,* 128 Kans. 174, 277 Pac. 54, 64 A. L. R. 606. It may well be that the situation of the parties and the attendant circumstances warranted the construction given the contracts in the three preceding cases but as heretofore shown those here appearing, in our opinion, in all reason, compel a different construction. As already shown by the authorities, the form of the contract in question is not particularly material and although it may be indicative of the intention of the parties it is not necessarily conclusive of the same. As far as form is concerned, it would seem that the contract in the *Ingersol* case, *supra,* is no more, if as much, indicative of the necessary intention than the contract in the form used in the present case.

It cannot be said that this lien is void as being in contravention of U. S. Rev. Stat. sec. 3477, U. S. C. A. title 31, sec. 203, under *Manning* v. *Leighton,* 65 Vt. 84, 93, 26 Atl. 258, 24 L. R. A. 684, and cases cited therein. See also Ann. 64 A. L. R. 611 with special reference to *Nutt* v. *Knut,* 200 U. S. 13, 26 S. Ct. 216, 50

L. ed. 348, therein referred to. If it can be said that the statements in the Manning case were necessary to its decision and constitute a holding contrary to that herein made on this point . the answer appears in *Martin* v. *National Surety Co.*, 300 U. S. 588, 57 S. Ct. 531, 81 L. ed. 822. Prior to the decision in that case there existed considerable confusion in the cases from that Court having to do with the question of whether contracts creating liens for contingent fees on the part of attorneys prosecuting claims against the Government were void. One line as evidenced by those cited in the Manning case and by the later case of *Nutt* v. *Knut, supra,* held that they were void. Another line referred to in the Martin case took the view that the purpose of this statute was to give protection to the Government and that when that protection was not needed or had been waived the statute did not apply. This confusion and conflict was ended in the Martin case which held that to the extent that the two lines are in conflict the latter must be held to be supported by the better reason. Consequently under the authority of this case the fund having been paid over by the Government so that it has no concern in this litigation the statute does not apply. See also *Lay* v. *Lay,* 248 U. S. 24, 39 S. Ct. 13, 63 L. ed. 103, affirming 118 Miss. 549, 79 So. 291, and *McGowan* v. *Parish,* 237 U. S. 285, 35 S. Ct. 543, 59 L. ed. 955.

There can be no question as to whether a lien of this kind can be asserted against a fund recovered for the State. For cases bearing on this matter see Anns. 2 A. L. R. 274 and 24 A. L. R. 933. One ground running through those denying the right to assert a lien on public funds is that to grant such right would be against public policy. But neither this nor any other objection to such right apply in the present case. The lien here is based on a contract entered into by the State through its then governor with full authority to contract and by authorizations broad and unlimited in their scope. Here the client was capable of so controlling the fund as to subject it to a lien. The broad powers granted under the joint resolution constituted ample authority for the creation of this lien by the contract. A case much in point is that of *In Re Paschal,* (*Texas* v. *White*) 10 Wall. 483, 486, 19 L. ed. 992. In that case the attorney was employed by the governor of the State of Texas whose power

to so contract under a special statute was not disputed. In the letter employing the attorney it was stated: "Your compensation will be dependent upon the action of a future legislature, unless a recovery is had in the suit, in which event I shall feel authorized to let you retain it out of the amount received." It was held that the attorney had a lien on the funds which he had collected under the agreement. The fact that here the fund is not in the possession of the petitioners does not, in our opinion, distinguish the case from the present one. The principle involved is the same in each. In *People ex rel. Stephens* v. *Holten*, 304 Ill. 394, 136 N. E. 738, which is the basis for the annotation in 24 A. L. R. 933 the principle is recognized that the right of the contracting party to so control the fund as to subject it to a lien does away with any question of the right to assert a lien on public funds.

▪ Even though the petitioners have a lien on the fund, is payment barred to them because of the provisions of our Constitution and statutes? We hold not. Section 27 of chapter II of the Constitution provides that "no money shall be drawn out of the treasury, unless first appropriated by act of legislation." The purpose of this provision is "to secure regularity, punctuality and fidelity in the disbursement of the public money." *Montpelier* v. *Gates,* 106 Vt. 116, 120, 170 Atl. 473, 474, quoting from Story, Const. sec. 1342. This provision means that no money shall be drawn from the treasury except in pursuance of law. Same case at page 122. If the wording of this provision is to be taken literally it is apparent that we will not issue this writ to command these officers to do something that they are prohibited from doing as there has been no appropriation here by the Legislature. 34 Am. Jr. 949, sec. 174. But it cannot be said that this provision is to be given such a construction. That the Legislature has apparently recognized that such construction is not warranted is indicated by P. L. 512 which exempts funds held by the State in trust from the requirement that no moneys shall be paid out of the treasury except upon specific appropriation. See also sec. 29 of No. 26 of the Acts of 1941 which recognizes the trust fund exception and also another exception by providing that this appropriation act shall not be construed in any way to negative or impair laws relating to

lawful rebates from the state treasury. It is apparent that if such a literal construction were given, absurd results might follow. If it should appear that through some mistake the sum of, to illustrate, ten dollars belonging to a certain person had found its way into the state treasury then under a literal construction of the Constitution it could not be paid out without a special appropriation although all parties agreed that the State had no right to it, legally and equitably. The amount does not alter the principle involved. Surely the framers of the Constitution could not have intended any such consequences. The clear construction to be given to this provision is that they intended to have it apply only to such funds, the equitable as well as the legal rights to which are in the State, and that this intent was recognized at the time of its adoption. That the Legislature has apparently recognized this intent is indicated by its exemptions of trust funds and rebates heretofore referred to from its acts requiring appropriations before payment. Although the legal title to the whole fund no doubt is in the State the petitioners have equitable rights to that portion of the same which represents their fee. This part in all equity and good conscience belongs to them. They have earned it and should receive it. This portion of the fund never legally and equitably belonged to the State as part of its public funds for, at the latest, when received, the lien attached to it and remains upon it so that it is held by the State subject to the same. It is not necessary to determine the exact nature of these equitable rights which the petitioners have in the fund for all of the cases having to do with such liens recognize that the owner of the same can enforce such rights against the owner of the fund in the way of securing payment from the fund in satisfaction of the lien. Here the money is to be drawn from the treasury in pursuance of law and this satisfies the requirements of the Constitution. *Montpelier* v. *Gates, supra.*

There is no need for an extended discussion of the statutes heretofore referred to and which the defendants claim prohibit the payment of this fund without a specific appropriation by the Legislature. It is sufficient to say that by their terms none of them are more drastic or far reaching in the way of prohibiting the issuing of warrants by the auditor of accounts except for the payment of money so appropriated or the disbursement by the

state treasurer except upon such warrants than the constitutional prohibition upon which they are apparently based. What we have said in regard to this latter prohibition applies with equal force to these statutory prohibitions. That the Legislature did not intend that these restrictions should apply to funds not legally and equitably owned by the State as a part of its public funds is clearly evidenced by the various exceptions heretofore noted. Here no legislative appropriation is necessary to pay this claim, for, to use the language of the petitioners, ''the fund provides its own appropriation.''

That there is a sufficient amount in the fund into which the money received from the United States was paid from which to pay the fee of the petitioners is not and, it would seem, could not be questioned. The withdrawal from this fund to make the payment of course involves a matter of bookkeeping but ''an honest creditor is not to be denied, simply because the payment of his claim may somewhat upset the treasurer's books.'' *Montpelier* v. *Gates*, 106 Vt. 116, 122, 170 Atl. 473, 475.

The defendants in their oral argument and in their brief raise no objections to the issuance of the writ other than the constitutional and statutory ones heretofore discussed as far as the petitioners' claim based on an equitable lien is concerned. They, in effect, concede that if these objections do not exist the petitioners should be paid. Consequently it becomes unnecessary to decide whether there are any other reasons existing to prevent the issuance of a writ of mandamus in this case. Inasmuch as the only objections to this ground for issuance raised by the defendants have been removed, we have decided, in the exercise of our discretion, to grant the petition in so far as the amount already received is concerned, with interest thereon from March 12, 1942, the date of its receipt.

Our holdings on this point make it unnecessary to discuss the other grounds on which the petitioners rely for relief.

The petitioners cite no authorities in support of their claim that the defendants should be ordered in this writ to pay their fee on the item of $234.24 which may be received some time in the future and we will spend no time in a search which it would seem would be futile.

*Judgment that the prayer of the petition in so far as it relates to the sum received from the United States be granted, without costs, and that a mandate issue forthwith directing the auditor of accounts to draw orders on the state treasurer for the amount of $22,503.96 due to the petitioners with interest thereon at 6% from March 12, 1942, to date of the issuing of the orders, and directing the state treasurer to pay the same, when presented, out of the fund in which the sum received from the United States was deposited.*