Brady v. CU York Insurance Co, No. S1223-02 Cnc  (Norton, J., June 27, 2005)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]


STATE OF VERMONT                                               SUPERIOR COURT
Chittenden County, ss.:                                    Docket No. S1223-02 CnC



EDWARD AND ROSEMARY BRADY

v.

CU YORK INSURANCE COMPANY,
ONE BEACON INSURANCE GROUP,
and J.W. & D.E. RYAN, INC.



ENTRY

        This matter came before the court in a May 23, 2005 evidentiary hearing on several motions. The defendants request that the court enforce a mediated settlement agreement that the parties allegedly executed on December 9, 2004. The plaintiffs, Edward and Rosemary Brady, request that the court deny this agreement and bar defendant's counsel, Gregory S. Clayton of Aten Clayton & Eaton PLLC, from further participating in this action. Also pending before the court is the Bradys' former attorney's request that the court order the defendants to remit $9,066.67 in fees and expenses directly to her out of the settlement amount.

        The overall dispute arose from water damage to the Bradys' home and to personal property therein on October 16, 2001. The Bradys filed a claim under an insurance policy with the defendant insurance companies. The insurance companies paid part of the claim, but allegedly disputed most of it. The Bradys brought suit, and later included a claim against J.W. & D.e. Ryan, Inc., their plumber. After more than two years of litigation, the parties underwent mediation on December 9, 2004. Joan Loring Wing served as the mediator under a mediation agreement signed by all parties. After mediation, all parties signed a hand-written "Stipulation & Settlement Agreement" providing:

                The parties agree that this matter is settled by payment of $40,000
                — (new money) by the defendants to plaintiffs. Plaintiffs to

execute general releases to all defendants, including standard ~~indemnification~~ language. Mutual release to be issued by One Beacon/CU York Insurance Co. to Brady Galleries, Inc. to be included on releases.

Following this settlement, the defendants submitted proposed releases to the Bradys, who subsequently refused to sign the releases for a number of reasons. The instant motions ensued. The Bradys also discharged their attorney and are now pro se.

In general, the law favors settlements. Smith v. Munro, 134 Vt. 417, 420 (1976). Courts can enforce settlement agreements as contracts, either summarily, by a motion to compel performance in the original action, or by separate action founded upon the settled agreement. Petition of Telesystems Corp., 148 Vt. 411, 412 (1987). In this case, the defendants are pursuing enforcement through the second means, that is, through a motion in the original action. Vermont law, however, requires that such enforcement occur only after the court approves of the terms of a settlement agreement and enters an appropriate judgment order based on the agreement. Id. at 413. "This will minimize the possibility that unconscionable terms of settlement are accorded the force and effect of a judgment order." Id.

A party can defend against a settlement enforcement motion with the same defenses that the party may have against a contract. See, e.g., Spaulding v. Cahill, 146 Vt. 386, 390 (1985) (recognizing mistake as possible defense to settlement agreement enforcement); Howard v. Howard, 122 Vt. 27, 32 (1960) ("If the compromise has been achieved on a false and fraudulent claim, wholly without foundation, the contract may be avoided and the property transferred may be recovered."); Sparrow v. Cimonetti, 115 Vt. 292, 301 (1948) (recognizing mistake, fraud, and bad faith or misrepresentation as defenses to settlement agreement enforcement); see also 15A Am. Jur. 2d Compromise and Settlement §§ 39–46 (2000).

Here, the parties have not submitted a fully integrated settlement agreement for approval by the court. They have submitted the "Stipulation & Settlement Agreement," but this document does not identify all the terms to the alleged settlement. Instead, it states: "Plaintiffs to execute general releases to all defendants, including standard ~~indemnification~~ language. Mutual release to be issued by OneBeacon/CU York Insurance Co. to Brady Galleries, Inc. to be included on releases." The defendants submitted the releases that they sent to the Bradys, but there is at least one deficiency with these draft releases. As explained below, the court will require a draft judgment order with a fully integrated agreement, including revised draft releases, before ruling on an enforcement motion.

The Bradys claim several defenses against enforcement of the settlement following their refusal to sign the releases. They claim that the release for J.W. & D.E. Ryan requires that they indemnify this defendant and that they never agreed to such an arrangement. The court agrees that the parties crossed out the word "indemnification" on the "Stipulation & Settlement Agreement" Accordingly, the court requires a release for J.W. & D.E. Ryan without indemnification language prior to approving the settlement and issuing a judgment order.

The Bradys also claim that they will not sign the releases and comply with the agreement because of threats by Attorney Clayton during the mediation process. As an initial matter, the court notes that the Bradys have violated the terms of the mediation agreement by repeating Attorney Clayton's specific statements at the mediation. The mediation agreement provides that the mediation is "entirely confidential. No publication or other disclosure of the statements or any other acts in the mediation session may be made without the prior written express consent and approval of all parties and the mediator."[1] Of course, confidential information is not necessarily privileged, and the parties cannot, by agreement, create a privilege for all communications within the mediation session. Lawson v. Brown's Day Care Ctr., Inc., 172 Vt. 574, 575 n.2 (2001) (mem.). So despite the Bradys' violation, the court will consider the evidence of Attorney Clayton's misconduct. See id. at 575 (overturning court sanctions order that was, in effect, "broad enough to make a person who commits professional misconduct, even criminal misconduct, during a mediation immune from disciplinary sanction or prosecution because no one can lawfully disclose the misconduct").

Nevertheless, Attorney Clayton and Wing both denied the statement that gave rise to the Bradys' alleged duress. Wing testified that she was with the parties and their attorneys whenever discussions occurred and that Attorney Clayton never made the alleged statement. The court finds that she is a credible witness. The evidence therefore weighs in favor of a finding in the defendants' favor on this claim.

The Bradys offer several other reasons as to why the releases and the overall settlement agreement are not binding. First, the Bradys claim that the releases require that they release

---

[1] Confidentiality is also sanctified by the Vermont Rules of Civil Procedure. See V.R.C.P. 16.3(g) ("[A]ll written or oral communications made in connection with or during an alternative dispute resolution proceeding . . . are confidential and are inadmissible pursuant to Vermont Rule of Evidence 408."). But this rule extends only as far as V.R.E. 408, which renders inadmissible settlement statements offered "to prove liability for, the invalidity of, or the amount of the claim or any other claim." The Bradys appear to be offering Attorney Clayton's alleged statement not to prove liability, but to show duress and invalidate the settlement agreement.

nonparties. The court has reviewed the draft releases and does not note any language signifying a release of a nonparty, except that J.W. & D.E. Ryan's release also releases Peerless Insurance Group, which the court assumes is the insurer for this defendant. The Bradys have not asserted that they intend to file a related claim against Peerless Insurance Group, and the court does not view a release of a party's liability carrier as offensive to the underlying settlement agreement. But the Bradys are correct in arguing that these releases should not release other nonparties. The releases that the defendants ultimately submit with their fully integrated settlement agreement and proposed judgment order should not have any nonparties, with the exception of J.W. & D.E. Ryan's liability carrier.

Second, the Bradys claim that Attorney Clayton had a conflict of interest. For reasons explained below, the court does not find that the alleged conflict affected the Bradys' interests in this litigation. This claim therefore lacks merit.

Third, the Bradys claim that Wing violated the mediation agreement because she is a practicing attorney. The agreement provides that "although the mediator . . . is a licensed attorney, she is not practicing law and is not acting as an advisor to any of the parties." At the hearing on this matter, Wing testified that this language means that she was not practicing law related to the underlying dispute or as an advisor to the parties in the mediation. Although the agreement is less than artful, the court shares Wing's understanding of this language. A reasonable interpretation of this mediation agreement would restrict a mediator from being an advisor for either of the parties to the dispute. It would not restrict a mediator from practicing law altogether. Indeed, it is widely recognized that practicing attorneys serve as mediators. See, e.g., ABA Model Code of Professional Responsibility Canon 5–20 ("A lawyer is often asked to serve as an impartial arbitrator or mediator in matters . . . ."); Nancy A. Welsh, Stepping Back Through the Looking Glass: Real Conversations With Real Disputants About Institutionalized Mediation and Its Value, 19 Ohio St. J. on Disp. Resol. 573, 590–91 & nn. 67–68 (2004) (citing statistics which demonstrate that most attorneys value mediators who are litigators or who have substantive experience with law). To interpret this agreement as meaning that the mediator cannot be a practicing attorney would be unreasonable.

Fourth, the Bradys allege that Wing had a conflict of interest because she does business through referrals with the Bradys' former attorney, Lisa Chalidze. The mediation agreement contains no provisions regarding mediator impartiality or conflicts of interest. Furthermore, the Bradys point to no recognized standards of professional conduct for mediators to support their argument that the alleged conflict should negate the settlement agreement. Indeed, the court could not find any such standards in Vermont.

4

The Vermont Rules of Professional Conduct merely state that lawyers acting as mediators "may be subject to applicable codes of ethics, such as the Code of Ethics for Arbitration in Commercial Disputes prepared by a joint committee of the American Bar Association and the American Arbitration Association." Vermont Rules of Professional Conduct Rule 2.2 cmt. Efforts to develop professional standards for mediators are ongoing, but mediation occurs in varied specialized areas where general standards are often less helpful. See Craig McEwen, Giving Meaning to Mediator Professionalism, Disp. Resol. Mag., Spring 2005, at 3, 6. What general standards that do exist have faced criticism for this reason. See Charles Pou Jr., Enough Rules Already! Making Ethical Dispute Resolution a Reality, Disp. Resol. Mag., Winter 2003, at 19, 19.

Nevertheless, the Association for Conflict Resolution has published Model Standards of Conduct for Mediators, written by a collaboration of the American Arbitration Association, the American Bar Association, and the Society of Professionals in Dispute Resolution. See Model Standards for Mediators, available at http://www.acrnet.org/pdfs/original_model_standards.pdf. These Standards may be applicable in the instant case, but they do not support the Bradys' argument the mediated settlement here is invalid. The Standards provide:

> A Mediator Shall Disclose all Actual and Potential Conflicts of Interest Reasonably Known to the Mediator. After Disclosure, the Mediator Shall Decline to Mediate Unless all Parties Choose to Retain the Mediator. The Need to Protect Against Conflicts of Interest Also Governs Conduct that Occurs During and After the Mediation.

Id. Rule III. The Standards proceed to define a conflict of interest as

> a dealing or relationship that might create an impression of possible bias. . . . The mediator has a responsibility to disclose all actual and potential conflicts that are reasonably known to the mediator and could reasonably be seen as raising a question about impartiality. . . . A mediator must avoid the appearance of conflict of interest both during and after the mediation. Without the consent of all parties a mediator shall not subsequently establish a professional relationship with one of the parties in a related matter, or in an unrelated matter under circumstances which would raise legitimate questions about the integrity of the mediation process.

Id. Rule III.

Here, the Bradys allege that Attorney Chalidze referred them to the mediator for advice regarding an estate matter. At the hearing, though, Wing stated that she did not establish a

professional relationship with the Bradys after the mediation. Wing testified she was contacted with respect to the Bradys' estate matter, but she suggested other attorneys to handle the matter, as she was not interested in taking them on as clients. Wing also testified that she was friends with Attorney Chalidze, but she did not make a practice of receiving referrals from Attorney Chalidze's clients after mediating disputes involving those clients.

The hearing evidence does not "create an impression of possible bias" on the part of Wing. If anything, Wing did what she should have done as a mediator to the dispute: she declined to take the Bradys as clients. The mere fact that Wing is friends with Attorney Chalidze does not give rise to possible bias. Vermont is a small state with a small bar. Mediation would grind to a halt if mediators could not have any relationship with attorneys representing the parties in mediation. Finally, to the extent any relationship that Wing had with Attorney Chalidze raised a question of impartiality, the question would naturally come from the defendants, not the Bradys. An unduly cozy relationship with the Bradys' attorney, if one existed, could only have helped the Bradys. It would not cast any doubt on their ability to enter a valid settlement agreement.

The Bradys therefore raise no valid arguments as to why the settlement that they ultimately reached in mediation should not be enforced. Nevertheless, the court cannot entertain a motion to enforce this settlement agreement until judgment is entered, and the court cannot approve of the settlement agreement unless the parties submit a fully integrated agreement with appropriate releases. In particular, the releases should contain no language of indemnification on the part of the Bradys and should not release nonparties, with the exception of J.W. & D.E. Ryan's liability carrier. The defendants must also submit a proposed judgment order based on the fully integrated settlement agreement. Their motion for enforcement shall be continued until they make these submissions.

Turning to the Bradys' argument that Attorney Clayton should be barred from further appearing in this matter, the Bradys claim that Attorney Clayton represented both the defendant insurance companies and Carol Huber, an antique dealer. The defendant insurance companies engaged Huber as an expert concerning one of the Bradys' items that suffered water damage, and she allegedly faced potential liability in a dispute with James Hill, an auctioneer who was a possible witness for the Bradys.

There is no rule against an attorney representing both a party to a dispute and an expert witness for that party. The Rules of Professional Conduct prohibit representation of a client who is directly adverse to another client or where the representation may be materially limited by the lawyer's responsibilities to another client or to a third person or by the lawyer's own interests.

6

Vermont Rules of Professional Conduct Rule 1.7. Even under such circumstances, however, the lawyer may proceed with representation of both clients if the lawyer reasonably believes that there will be no adverse effect on either client and if both clients consent after consultation. Id.

Here, the Bradys have provided scant details regarding Attorney Clayton's representation of both the insurance companies and Huber, and there is no obvious conflict from the details provided. An expert witness is not directly adverse to the party for whom the witness testifies, and Attorney Clayton is not materially limited in representing either of these two parties because of his representation of both of them. Even if there are material limitations, Attorney Clayton could reasonably believe that there is no adverse effect and could have obtained consent from both parties. In any event, the court does not see how this conflict compromises the Bradys' position. The Bradys claim therefore lacks merit, and the court sees no reason to bar Attorney Clayton from appearing further in this matter.

Finally, the court turns to Attorney Chalidze's request that the court order the defendants to remit $9,066.67 in fees and expenses directly to her out of the settlement amount. Such an order is premature at this point, as the court has not yet enforced the settlement agreement. Nevertheless, Vermont law has long recognized a common law right to a charging lien for attorneys. Valley Disposal Inc. v. Cent. Vt. Solid Waste Management Dist., 113 F.3d 357, 362 (1997) (applying Vermont law). "[T]he lien gives an attorney the right 'to recover his taxable costs from a fund recovered by his aid, and also the right to have the court interfere to prevent payment by the judgment debtor to the creditor in fraud of his right to the same, and also to prevent or set aside assignments or settlements made in fraud of his right.'" Id. (quoting Weed Sewing Mach. Co. v. Boutelle, 56 Vt. 570, 578 (1882)). Thus, if the court should ultimately approve the settlement agreement and issue a judgment order, Attorney Chalidze shall be entitled to the appropriate amount of the settlement, in accordance with her common law lien. The defendants are hereby on notice of this lien and must comply with it in providing the settlement payment to the Bradys.[2]

---

[2] The court notes that the Bradys dispute the fact that they owe Attorney Chaldize any fees at all. Accordingly, Attorney Chalidze should proceed to arbitration to resolve her fee dispute with the Bradys. Vermont Rules of Professional Conduct Rule 1.5 cmt. The Bradys may be prejudiced in their fee dispute if Attorney Chalidze accepted the $9,066.67, or any fee amount, without holding it in escrow pending resolution of the fee dispute. See VBA, Advisory Ethics Op. 97–10 (1997). Ultimately, however, this is an issue to be worked out between the Bradys and Attorney Chalidze.

## ORDER

For the foregoing reasons, the defendants' motion is CONTINUED pending further submissions specified in this entry and the Bradys' motions are DENIED. Furthermore, the defendants are ordered to comply with Attorney Chalidze's lien on any future settlement disbursements in this matter.


Dated at Burlington, Vermont, June 27, 2005.


_____/s/_____
Judge

8